**ARCTIC TUG & BARGE, INC., an Alaska corporation, Appellant,**

v.

**RALEIGH, SCHWARZ & POWELL, Appellee.**

No. S–7908.

Supreme Court of Alaska.

April 10, 1998.

Roy Longacre, Longacre & Associates, Anchorage, for Appellant.

Peter J. Maassen, Ingaldson Maassen, P.C., Anchorage, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

COMPTON, Justice.

I. *INTRODUCTION*

Arctic Tug & Barge, Inc. (Arctic) appeals a partial final judgment dismissing its third-

party claim against Raleigh, Schwarz & Powell, Inc. (Raleigh). Raleigh, an insurance broker, procured coverage for Alaska Corporation (Alaska) on materials that Alaska had hired Arctic to transport. The materials came to harm, Alaska sued Arctic, and Arctic impled Raleigh. Arctic claimed that Raleigh had negligently misrepresented to it the terms of the insurance policy that Raleigh had procured for Alaska, and had thereby exposed Arctic to unexpected liability for subrogated claims. The superior court granted Raleigh summary judgment, and Arctic appeals. Finding no genuine dispute as to whether Raleigh owed Arctic any duty at all, we affirm.

## II. FACTS AND PROCEEDINGS

Alaska's president, William Olday, hired Arctic to take equipment belonging to Alaska[1] from Anchorage to Kodiak Island. Arctic told Olday that its insurance covered only its own vessels and that "it was standard or customary for the customer to provide insurance for [its own] equipment or cargo."

Alaska asked its broker, Raleigh, to procure insurance for its equipment. Olday affied that Alaska "never requested that [Arctic] be made an additional insured or beneficiary." Raleigh's employee John Elliott spoke to underwriters, perhaps discussing waivers of subrogation with one of them, but ultimately procuring from another a policy that did not waive subrogation.[2]

Raleigh and Arctic communicated only once. Raleigh contacted Arctic to say that Alaska's insurance company needed information on the barge that Arctic would use to transport Alaska's equipment. Arctic's president, Debra Pickworth, had an employee fax

the information to Elliott. Pickworth did not ask why the underwriter needed the information, and Elliott had no further discussion with any Arctic employee.

Sailing on a stormy night, Arctic's tug and barge met rough seas en route to Kodiak with Alaska's equipment. Much of the equipment was lost overboard or damaged.

Alaska sued Arctic for negligence, breach of contract, and unseaworthiness. Arctic brought a third-party complaint against Raleigh. It claimed that the policy Raleigh had procured for Alaska "was deficient and did not provide the necessary coverage to Arctic ... [who,] [a]s a result of the deficiencies in the insurance contract ... has incurred damages." Raleigh moved for summary judgment, noting Arctic's failure to mention a legal theory entitling it to relief. Arctic's opposition introduced the theory that Raleigh had committed negligent misrepresentation by failing to disclose to Arctic that the policy did not waive subrogation. The superior court granted Raleigh summary judgment. It made that judgment final, and thus appealable, under Alaska Civil Rule 54(b).[3] Arctic appeals.

## III. DISCUSSION

### A. Standard of Review and Summary of Issues

We review summary judgments de novo. Drawing all reasonable inferences in favor of the nonmovant, we determine whether the parties genuinely dispute any facts material to a viable legal theory and, if not, whether the undisputed facts entitle the movant to judgment as a matter of law. See Maddox v.

---

1. Some of the equipment belonged to its subcontractor and coplaintiff Merwin Arneson, d/b/a Mat–Su Aggregate. This opinion jointly refers to Alaska and Mat–Su as "Alaska."

2. A waiver of subrogation would have, as a practical matter, protected Arctic from liability by ensuring that, if Arctic negligently harmed Alaska's equipment, Alaska's underwriter would reimburse Alaska for its property loss without acquiring Alaska's right to sue Arctic for damages.

3. Raleigh thereafter moved for full attorney's fees and a sanction under Civil Rules 11, 82, and 95. Raleigh showed that Arctic had contacted it two

weeks before the end of the two-year period of limitation for civil claims, asking Raleigh to sign an agreement to toll the period pending Arctic's investigation of whether to sue. Raleigh declined. Arctic filed its complaint two days before the period would have run without having investigated its case against Raleigh or identified a viable legal theory. The court awarded Raleigh full fees and a further $1,000 sanction, finding Arctic's negligent-misrepresentation theory "not well grounded in fact and warranted by ... law" and deeming it vexatious for Arctic to have raised it for the first time in opposing summary judgment. Arctic has not challenged the award and sanction on this appeal.

*River & Sea Marine, Inc.*, 925 P.2d 1033, 1035 (Alaska 1996). Arctic claims that there are genuine disputes of material fact, and that, based on the facts that are not disputed, its negligent-misrepresentation claim is legally viable.

B. *Arctic Has Identified No Factual Issues that Are Both Genuinely Disputed and Material to Its Negligent–Misrepresentation Claim against Raleigh.*

Arctic alleges three genuine disputes of material fact. None of the three is both genuine and material to Arctic's theory of Raleigh's liability. Its theory is that Alaska promised to insure its equipment completely, protecting Arctic from any liability, even for its own negligence. Raleigh, the theory goes, knew or should have known of that promise when it procured a policy for its client, Alaska. It thus had a duty to Arctic to disclose that it had procured a policy that did *not* waive subrogation, since it knew or should have known that Arctic was relying on it to procure a policy that did. By breaching that duty to disclose, Raleigh committed the tort of negligent misrepresentation by omission. We discuss that tort fully in Part C below; the key requirement for present purposes is that the defendant owe the plaintiff a duty to disclose.

The first factual dispute that Arctic identifies is with Alaska, as to "the terms and extent of [Alaska]'s agreement to bear the risk of loss." That dispute, though, is only between Arctic and Alaska, and only indirectly relevant to this appeal. Even should Arctic win the dispute—i.e., show that Alaska did promise to insure Arctic against liability for its own negligence—it would not thereby establish that Raleigh owed it any duty.[4]

Arctic claims that the second factual dispute concerns what instructions Alaska gave Raleigh. There is no such dispute. Olday affied that Alaska "never requested that [Arctic] be made an additional insured or beneficiary" and never asked that the policy cover Arctic. Arctic attacks Olday's motives and credibility in making this statement and derides it as "self-serving," given its bearing on the issue of who bore the risk of loss between Alaska and Arctic—a crucial issue in the main suit. Arctic only once contradicts the substance of the affidavit, however, tentatively opining in its brief that "Raleigh's instructions [from Alaska] were probably not clear." Arctic does not support this speculation with any evidence.

Arctic thus attacks the credibility and motives of Raleigh's affiant and hints that his affidavit is untrue without offering any competent contradictory evidence. We have noted that such tactics will not suffice to avoid summary judgment. *See Turnbull v. La-Rose*, 702 P.2d 1331, 1335 (Alaska 1985) (cautioning that "fact that a party desires to have an affiant's statements tested by a jury, in and of itself, will not preclude a grant . . . [of summary judgment] unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine issue of material fact") (quoting 10A Charles A. Wright & Arthur Miller, *Federal Practice and Procedure: Civil* § 2730, at 237–38 (2d ed.1983) (alteration in original)); *see also Miller v. City of Fairbanks*, 509 P.2d 826, 831 (Alaska 1973) ("[T]o put the affiant's credibility in issue, specific facts must be properly produced."). Arctic cannot avoid summary judgment by conclusorily attacking Olday's credibility.[5]

---

4. Even if Alaska was bound to have Raleigh insure Arctic against its own negligence, that would only give Arctic a claim *against Alaska,* for breach of contract, if it failed to do so. *See Dresser Indus., Inc. v. Foss Launch & Tug Co.,* 560 P.2d 393, 395 (Alaska 1977) (holding that parties to a marine bailment contract can "provide by express terms that one party is responsible for procuring full insurance for the benefit of both parties [and is thus] responsible for the total risk of loss"). *Dresser* notes that "provisions exempting a party from liability for [its] own negligence must be clearly set forth." *Id.* Even if Arctic can meet this standard in its suit *against*

Alaska—a question on which we express no view—that would not give it a negligent-misrepresentation claim *against Raleigh.* Arctic could only possibly have such a claim if Alaska did tell Raleigh to obtain a waiver, Raleigh knew or should have known that Arctic was relying on it to do so, and yet it failed either to do so or to warn Arctic that it had not.

5. Arctic notes that Elliott obtained "at least one insurance quote which would have protected [Arctic]" and suggests that this act is "highly probative . . . as to his instructions [from Alaska]." Arctic also suggests that Alaska's alleged

■ Arctic's last alleged factual dispute concerns its own "expectations ... after Raleigh indicated that it would proceed with the insurance assignment for the voyage." Arctic has neither alleged nor shown that it told Raleigh that it expected Raleigh to procure a waiver of subrogation. Its unvoiced, unilateral expectations are irrelevant to the question of whether Raleigh owed it a duty of disclosure.

Arctic has thus shown no genuine dispute relevant to any material issue. We must affirm summary judgment unless the undisputed facts did not entitle Raleigh to judgment as a matter of law, or unless Arctic is correct to read our precedents to establish a rule against summary adjudication of the disputed existence of tort duties.

C. *Raleigh Was Entitled to Judgment as a Matter of Law Because It Owed Arctic No Duty to Disclose.*

■ Arctic charges Raleigh with negligent misrepresentation by omission. *See* Restatement (Second) of Torts § 551 (1977). We have adopted, verbatim, the Restatement's expression of the rule:

1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability [as for an affirmative misrepresentation] *if, but only if, he is under a duty to the other* to exercise reasonable care to disclose the matter....

*Turnbull,* 702 P.2d at 1334 (quoting Restatement (Second) of Torts § 551) (emphasis added); *see also Matthews v. Kincaid,* 746 P.2d 470, 471 n. 2 (quoting "if, but only if he is under a duty to the other" proviso). Raleigh was entitled to a judgment as a matter of law because Arctic has identified no genuinely disputed facts suggesting that Raleigh owed it any duty at all.

As we have seen, Raleigh did not know of Arctic's reliance on it to procure a waiver of subrogation. Arctic nonetheless suggests that Raleigh had a legal duty to disclose because, even if it did not know of Arctic's reliance, it reasonably should have known— i.e., it should have inferred that Arctic was relying on it.[6] Assuming *arguendo* that a party can incur a duty to disclose under section 551 without actually knowing of another's reliance, Arctic has alleged no facts from which Raleigh reasonably should have inferred Arctic's reliance.

A Michigan case offers an instructive contrast. In *United States Fidelity & Guaranty Co. v. Black,* 412 Mich. 99, 313 N.W.2d 77 (1981), a developer, Black, repeatedly complained to an insurance broker about how much personal liability the broker's client, an underwriter, was requiring Black to assume to indemnify the underwriter before it would underwrite bonds for a project. *See id.* 313 N.W.2d at 79–80. Before signing an indemnity agreement, Black insisted on measures to limit that liability and asked the broker if the other indemnitors had signed agreements. *See id.* at 80–81, 88. The broker stated his mistaken belief that they had. He later learned of his error but did not disclose it to Black, who eventually signed. *See id.* at 80–81, 89. When Black charged the broker with silent fraud, a tort like negligent misrepresentation that also requires a duty to disclose, *see id.* at 88, the Michigan Supreme Court granted relief. It reasoned that Black (and his partner Haughey)

had discussed with [the broker] their concern over their potential liability under the indemnity agreement and were openly attempting to limit this liability.... [The broker's employees] ... *knew, or reason-*

---

agreement to bear all risk of loss makes it likely that Alaska told Raleigh to obtain a policy waiving subrogation. Such thin reeds of circumstantial evidence, though, can not make up for the lack of any direct evidence that Alaska ever told Raleigh to procure a waiver of subrogation.

6. Section 551 suggests that liability for negligent failure to disclose can arise only between two parties engaged "in a business transaction" *with one another.* *See* Restatement (Second) of Torts

§ 551(2) ("One party to a business transaction is under a duty ... to the other...."). Since Raleigh transacted business only with Alaska, its client, it is hard to see how Arctic comes within section 551's protective ambit. We nonetheless assume *arguendo* that the "duty" required by section 551 could in some case arise between an insurance broker and a company whom the broker's client hires to ship goods for which broker procures insurance.

*ably should have known, that Black and Haughey were relying on the[ir] representations....*

[T]he agents had a duty to disclose .... because they knew that [Black and Haughey] were very concerned with whether all of the other parties had signed [the indemnity agreements]....

*Id.* at 88–89 (citing Restatement (Second) of Torts § 551) (emphasis added).

The court stressed Black's repeated expressions of concern about potential liability to the broker; Arctic mentioned no concerns about potential liability to Raleigh in their one very brief contact. Black's questions and comments should have led the broker to infer his reliance, and in comparison they highlight the untenability of Arctic's claim that Raleigh should have inferred Arctic's silent reliance from the circumstances of this case.

D. *This Court's Precedents Do Not Bar a Summary Judgment that No Tort Duty Exists between Two Parties.*

Arctic argues that summary judgment was inappropriate because our precedents establish that questions of the existence or scope of a tort duty are peculiarly within "the province of the jury." We have made statements suggesting a strong presumption along such lines. *See, e.g., Maddox,* 925 P.2d at 1035 ("As a general rule, issues of negligence such as [the scope of seller's duty to warn buyer of dangerous defect] are not susceptible to summary judgment due to the highly circumstantial judgments required in their determination ....") (citing *Webb v. City & Borough of Sitka,* 561 P.2d 731, 735 (Alaska 1977)); *id.* at 1036 n. 5 (noting "general rule against summary judgment in cases determining whether a duty exists"); *Swenson Trucking & Excavating, Inc. v. Truckweld Equip. Co.,* 604 P.2d 1113, 1118–19 (Alaska 1980) (reversing summary judgment regarding duty to detect defect while repairing truck) (quoting *Webb,* 561 P.2d at 735 ("[I]ssues of negligence are generally not susceptible to summary determination....")). But Arctic reads *Maddox* too categorically. We have elsewhere held it appropriate to summarily adjudge disputed

questions of tort duty when the undisputed facts support only one reasonable inference. *See Smith v. State,* 921 P.2d 632, 634 (Alaska 1996) ("The 'precise nature and extent' of a duty 'is a question of law which can be decided at the summary judgment stage.'") (quoting *Mulvihill v. Union Oil Co.,* 859 P.2d 1310, 1314 n. 4 (Alaska 1993)).

Our precedents concern two sorts of questions of tort duty. In cases where no one disputes the existence of a duty running from one party to another, we have disfavored summary adjudication of the precise scope of that duty, or of whether particular conduct did or did not breach it (i.e., constitute negligence). *See, e.g., Maddox,* 925 P.2d at 1036–39 (noting seller's undisputed duty to buyer to warn of, or make safe, products dangerous for their intended use, and reversing summary judgment on fact-specific questions of whether particular use was foreseeable, and particular danger obvious); *Webb,* 561 P.2d at 733–35 (abolishing common-law distinctions between trespassers, licensees, and invitees; finding that city as landowner had duty to foreseeable sidewalk users to maintain sidewalk "in a reasonably safe condition in view of all the circumstances"; and reversing summary judgment because "issues of negligence are generally not susceptible to summary determination"). This is particularly so when the scope of the duty poses a fact-specific question, involving policy and "circumstantial judgments" that our legal system reserves for the jury. *See Maddox,* 925 P.2d at 1035–36.

On the other hand, summary judgment is proper where the only reasonable inference from the undisputed facts is that one party owed another no duty whatsoever—or owed a duty clearly and vastly narrower in scope than the one that the other party asserts in opposing summary judgment. *See Mulvihill,* 859 P.2d at 1313–14 (holding that couple who drove drunken coworker home, tried to dissuade him from driving, and left, after which he did drive and had fatal accident, had undertaken limited duty to get him home safely and could not reasonably be found to have undertaken much broader duty to ensure that he not drive again that night); *Estate of Breitenfeld*

*v. Air–Tek, Inc.,* 755 P.2d 1099, 1102–03 (Alaska 1988) (holding that firm undertook narrow duty to procure replacement part for airport safety system but did not undertake much broader task of ensuring system's overall effectiveness in interim, so as to owe duty to pilot killed in crash before replacement part arrived).

Most recently, *Smith* involved the state's liability to the family of a child poisoned by excessive fluoride in a town for whose water fluoridation system the state had taken a disputed amount of responsibility. *See Smith,* 921 P.2d at 633–34. The parties contested whether the state had undertaken only to replace a few parts in the system, which it did well, or had undertaken the much broader task of ensuring the system's proper functioning, which, if so, it did not do with due care. *See id.* at 634. Although we reversed a summary judgment in the state's favor, because we found a genuine dispute as to which duty it had in fact undertaken, we made clear that we did not do so because summary judgment was categorically inappropriate on a question of tort duty. *See id.* at 635 ("Where reasonable people could not differ over the nature and extent of the act undertaken, summary judgment is appropriate.").

■ We thus hold that summary judgment is appropriate on a question of duty in a tort case, like this, where the only reasonable inference from the undisputed facts is that no tort duty existed between one party and another.[7] Such a judgment is not barred by our precedents disfavoring summary adjudication of questions of tort duty— both because those precedents express disfavor rather than a categorical rule of law,[8] and because the rule of thumb in those precedents arose in cases involving questions of the disputed scope or fulfillment, not the existence, of a tort duty.

■ We do not mean, in noting this difference, to establish a talismanic distinction between questions of the "existence" and the "scope" of tort duties. The standard for summary judgment is the same in either type of case: there must be no genuine dispute of material fact and the movant must be entitled to judgment as a matter of law. *See, e.g., Maddox,* 925 P.2d at 1035; *Breitenfeld,* 755 P.2d at 1102. Summary judgment is neither freely given in the former type of case nor strictly forbidden in the latter. The difference we observe among our precedents merely reflects the fact that, as a practical matter, it is much harder to show that there are no genuinely disputed material facts when the existence of a duty is clear and the question is of its precise scope, or whether given conduct fulfilled it. Our statements disfavoring summary judgment in such cases do not establish a separate rule of law from the normal summary judgment standard, but a rule of thumb to remind courts of that practical observation.[9] That rule has no ap-

7. As we noted above, summary judgment is also appropriate in cases, like *Mulvihill* and *Breitenfeld,* where a party owed another a narrow duty, but no jury could reasonably infer from the undisputed facts that it owed a vastly, qualitatively broader duty, as claimed by the other.

8. We see the dangers of a categorical approach in Arctic's unduly literal reading of a statement that suggests a flat ban on summary adjudication of questions of tort duty. *See Maddox v. River & Sea Marine, Inc.,* 925 P.2d 1033, 1036 n. 5 (Alaska 1996) ("This court has previously applied the general rule against summary judgment in cases determining whether a duty *exists* . . . . The same circumstantial judgments are required . . . as in other negligence cases.") (citing *Saddler v. Alaska Marine Lines, Inc.,* 856 P.2d 784, 787 (Alaska 1993)) (emphasis added). While *Saddler* did turn on whether a duty existed, *Maddox* did not. The issue in *Maddox,* as the bulk of our opinion made clear, was not the existence but the scope of a

duty, and whether particular conduct satisfied it. *See id.* at 1036 ("The outcome of this case turns upon the *scope* of a seller's duty to protect the customer from hazards potentially posed by the seller's product.") (emphasis added). Read in context, our passing reference to "whether a duty exists" did not reject our precedents allowing summary judgment when, as here, the undisputed facts inescapably show that one party simply owed the other no duty.

9. And in some cases it is unclear whether a dispute concerns the existence or the scope of a duty; one can frame it either way. If we implied that different rules of law apply to "existence" and "scope" cases, competent lawyers on each side of future tort cases might focus on framing every dispute as involving the "existence" or "scope" of a duty, as suited their respective clients. In some cases, the resultant semantic battles would shed more metaphysical heat than light.

plication in a case, like this, where no evidence tends to suggest that any duty has arisen between a defendant and plaintiff.

## IV. CONCLUSION

We therefore AFFIRM the judgment below.