Nanette SAUVE, Appellant,

v.

Dennis M. WINFREE and Bill H. Nix, Appellees.

No. S–8626.

Supreme Court of Alaska.

Aug. 20, 1999.

---

James T. Brennan and Amy Vaudreuil, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellant.

Daniel T. Quinn, Richmond & Quinn, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

After falling down a stairway at her place of employment, Nanette Sauve sued the premises owners, Dennis Winfree and Bill Nix, who were also the officers and sole shareholders of Sauve's corporate employer. The superior court granted summary judgment to Winfree and Nix after concluding that their landlord duties were inextricably intertwined with their corporate duties and, thus, that they were immune as co-employees under the Workers' Compensation Act. Because Sauve raised a genuine issue of material fact as to whether Winfree and Nix's negligence as landlords caused her injury, we reverse the superior court's grant of summary judgment and remand for trial.

## II. FACTS AND PROCEEDINGS

In 1989 Nanette Sauve began working as a retail clerk for Alaska Seapac, Inc., d/b/a 10th & M Seafoods (10th & M), in a two-story office building in Anchorage. On August 17, 1992, Sauve fell down a flight of stairs in the office building while working. She had undergone knee surgery twelve days before the accident as a result of a non-work-related incident earlier that year, and the fall aggravated her knee injury. 10th & M paid Sauve both medical benefits and workers' compensation benefits for a period of missed work due to disability after she fell.

Dennis Winfree and Bill Nix are the sole shareholders, board members, and officers of 10th & M. Like Sauve, both Winfree and Nix are salaried, full-time employees of 10th & M. Sauve reported to Winfree and Nix, each of whom described himself as her supervisor.

Winfree and Nix also own the building housing 10th & M and lease it in its entirety to 10th & M through a partnership they created called ANW Investments. According to ANW's accountant, Russell Minkemann, ANW intended the lease to be a "triple net" lease—that is, a lease requiring the lessee, 10th & M, to pay all insurance, taxes, and costs of maintenance and repair for the leased premises. According to Minkemann, ANW's sole income came from the rent paid by 10th & M for the building. ANW's partnership tax returns through 1989 list the building at 10th & M as the partnership's address.

Minkemann also stated in his affidavit that, according to 10th & M's corporate tax returns, 10th & M has paid for all maintenance, repair, and improvements to the building during the course of the lease. Such repairs include work on the freezers, replacement of portions of ceilings and walls, and installment of non-skid material on the floors. Minkemann stated that all significant leasehold improvements to the building have been capitalized as assets of 10th & M and have been reflected in the depreciation schedules filed with the corporation's tax returns.

Rick Dawson, an Anchorage building contractor, stated in an affidavit that the stairway in question is a winding stairway prohibited in retail establishments under the Uniform Building Code.[1] Dawson stated that the staircase also exceeds the maximum rise allowed under the Code and that the width of portions of the tapered and fan-shaped treads on the stairs is too narrow.

In August 1993 Sauve sued Winfree and Nix in their capacity as owners of the building, claiming that, as landlords, they were liable for her injuries on the stairs. Superior Court Judge Milton M. Souter granted summary judgment to Winfree and Nix on the ground that, because they were also Sauve's co-employees at 10th & M, they were immune from liability under the exclusive remedy provision of the Alaska Workers' Compensation Act.[2]

In *Sauve v. Winfree (Sauve I)*,[3] we reversed and remanded the case, concluding that Winfree and Nix's liability turned on whether Sauve's injuries were caused by the structure of the staircase or by negligent performance by Winfree and Nix of their "corporate responsibility for the condition of the premises."[4] If the injury was rooted in corporate, rather than landlord, duties, then the exclusive remedy provision would apply and Sauve could not sue Winfree and Nix for her injuries.[5]

Following remand, Winfree and Nix again moved for summary judgment, alleging that Sauve's injuries arose from negligently performed corporate duties rather than landlord duties.[6] Alternatively, Winfree and Nix ar-

gued that, as landlords, they owed no legal duty to protect 10th & M's employees from injuries caused by the building's condition.

In December 1997 the superior court granted summary judgment to Winfree and Nix. Because the court concluded that Winfree and Nix's landlord obligations were "inextricably intertwined" with their corporate obligations, it declined to resolve the issue of whether landlord liability would otherwise attach. Sauve appeals.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."[7] We review a grant or denial of summary judgment de novo.[8]

The interpretation of a statutory provision, such as the exclusive remedy provision of the Workers' Compensation Act, is a question of law.[9] We resolve questions of law by adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[10]

### B. Lessors of Commercial Property Generally Owe a Duty of Care to Employees of a Business Tenant.

Sauve argues that the traditional common law rule of landlord immunity from tort liability[11] no longer applies to commer-

1. Anchorage has adopted every chapter of the Uniform Building Code except 1 (Accessibility), 29 (Plumbing), and 30 (Elevators). *See* Anchorage Munic. Code §§ 23.05.010, 23.15.010.

2. *See* AS 23.30.055.

3. 907 P.2d 7 (Alaska 1995).

4. *Id.* at 13.

5. *See id.*

6. Winfree and Nix do not concede that their actions were negligent in this case. For purposes of summary judgment, we treat Sauve's allegations of negligence as true. *See Sonneman v. State,* 969 P.2d 632, 635 (Alaska 1998) (view-

ing evidence in the light most favorable to the non-moving party for purposes of summary judgment).

7. Alaska R. Civ. P. 56(c).

8. *See Sonneman,* 969 P.2d at 635.

9. *See Borg-Warner v. Avco Corp.,* 850 P.2d 628, 631 n. 8 (Alaska 1993).

10. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

11. *See City of Fairbanks v. Schaible,* 375 P.2d 201, 205 (Alaska 1962); Restatement (Second) of Torts § 356 (1965).

cial leases and, thus, that Winfree and Nix are liable as landlords for injuries caused by a defective or dangerous condition on the 10th & M premises. Winfree and Nix respond that this court has only abrogated the common law rule with respect to residential leases. We agree with Sauve to the extent that commercial landlords owe a general duty of care to employees of commercial lessees.

In *Newton v. Magill*,[12] we abandoned the common law rule with respect to residential leases:

> The courts of a number of jurisdictions have begun to discard this common law rule ... in favor of the principle that landlords are liable for injuries caused by their failure to exercise reasonable care to discover or remedy dangerous conditions. These courts have relied in part on statutory or common law warranties of habitability and in part on a belief that the rule of landlord immunity is inconsistent with modern needs and conditions.[13]

We further noted in *Newton* that Alaska's adoption of the Uniform Residential Landlord and Tenant Act (URLTA)[14] in 1974 undermined the "theoretical foundation of the traditional rule of *caveat emptor.*"[15] Thus, we explicitly rejected the common law rule in favor of a rule based on general tort law that a landlord must act reasonably in view of all the circumstances.[16]

The harder question is whether such common law immunity has been abrogated in Alaska with respect to *commercial* leases as well. Winfree and Nix argue that the holding in *Newton* applies only to residential leases because the court justified its decision in part on Alaska's adoption of URLTA, which does not apply to commercial leases. At first glance, many of the rationales cited by the *Newton* court for abandoning the common law rule appear to apply with greater force to a residential landlord-tenant relationship:

> The legislature by adopting the URLTA has accepted the policy reasons on which the warranty of habitability is based. These are the need for safe and adequate housing, recognition of the inability of many tenants to make repairs, and of their financial disincentives for doing so, since the value of permanent repairs will not be fully realized by a short-term occupant.[17]

But many commentators have noted logical inconsistencies in the residential/commercial lease distinction. Most businesses, like residential tenants, are not "equipped to conduct sophisticated inspections of the mechanical and structural elements of a large commercial or industrial building."[18] And many small businesses have the same lack of bargaining power that gave rise to protections for residential tenants.[19]

---

**12.** 872 P.2d 1213 (Alaska 1994).

**13.** *Id.* at 1216.

**14.** *See* AS 34.03.010–.380.

**15.** *Newton,* 872 P.2d at 1217.

**16.** *See id.* We do not agree with Sauve's contention that we effectively abrogated the common law rule in a series of cases beginning with *Webb v. City & Borough of Sitka,* 561 P.2d 731 (Alaska 1977). In *Webb,* we held that a landlord's liability would no longer turn on the status of the plaintiff as trespasser, licensee, or invitee. *See id.* at 732. But as the superior court points out, the abandonment of the common law classifications of injured parties does not aid in the determination of who has the duty of care to such parties. At least one court has noted the fallacy in assuming that a partial retreat from common law distinctions signals a willingness to impose on landlords a duty of care to tenants. *See Bellemare v. Gateway Builders, Inc.,* 420 N.W.2d 733, 740–41 (N.D.1988) (noting that abandon-

ment of common law distinctions between licensees and invitees had no bearing on a landowner's duty to a tenant).

**17.** *Newton,* 872 P.2d at 1217.

**18.** Paula C. Murray, *The Evolution of Implied Warranties in Commercial Real Estate Leases,* 28 U. Rich. L.Rev. 145, 172 (1994) (citation omitted); *see also id.* at 172–73 ("Over ninety percent of American corporations have assets of under one million dollars. In fact, more than fifty percent of American corporations have less than $100,000 in assets."). *But see* Fred William Bopp III, *The Unwarranted Implication of a Warranty of Fitness in Commercial Leases—An Alternative Approach,* 41 Vand. L.Rev. 1057, 1081–82 (1988) (noting that businesses, due to profit motive, can afford to pay certain repair costs that residential tenants could not justify financially).

**19.** *See* Murray, *supra* note 18, at 172 ("[T]he vast majority of commercial tenants are not corporate giants that have the financial clout to bargain on

Still, courts in most other jurisdictions continue to apply the common law rule of landlord immunity to commercial leases.[20] "[A]lmost all the state legislatures that have adopted statutes protecting residential tenants from uninhabitable premises have refused to expand the protection to commercial tenants."[21] Only a few states—New Jersey, New York, California, and Texas—have moved toward recognizing an implied warranty of fitness or suitability in commercial leases.[22]

Notwithstanding courts' and legislatures' general hesitancy to make commercial landlords liable to their tenants, most courts allow the *employees* of commercial tenants to sue the landlord of the business premises on which the injury occurred.[23] In *Spence v. Citizens & Southern National Bank,*[24] the Georgia Court of Appeals allowed an employee to sue his employer's landlord based on the landlord's statutory duty to lease a safe premises.[25] And in *Mora v. Baker Commodities, Inc.,*[26] the California Court of Appeal allowed a suit by a worker against the premises owner despite a provision in the lease requiring the tenant employer to make repairs:

> [A] commercial landowner[ ] cannot totally abrogate its landowner responsibilities

merely by signing a lease. As the owner of property, a lessor out of possession must exercise due care and must act reasonably toward the tenant as well as to unknown third persons.[27]

The West Virginia Supreme Court held in *Pack v. Van Meter*[28] that an employee could sue both her employer *and* her employer's landlord for an injury caused by falling down a stairway that lacked a handrail.[29] The court concluded that both the employer and the landlord owed a duty of care to the employee:

> [T]he failure to maintain the stairway with handrails and the steps with a safe tread is a responsibility reasonably shared by the employer and the owner of the place of employment. . . . Courts in other jurisdictions have held that a tenant's employee, who is injured at his place of employment as a result of the landlord's violation of a safety statute or other applicable law, can maintain an action against the landlord to recover damages. . . . Furthermore, even in the landlord-tenant law, we have recognized that a landlord is not insulated from all liability with regard to injuries suffered by a third party on the leased premises.[30]

---

equal footing with the landlord or to adequately inspect premises for suitability and habitability."); Todd D. Ruggiero, *Brown v. Green and Hadian v. Schwartz: Determining Who Is Responsible for Major Structural Repairs in Commercial Leases,* 28 Pac. L.J. 417, 424 (1997).

20.  *See* Ruggiero, *supra* note 19, at 423; Murray, *supra* note 18, at 162–63.

21.  Murray, *supra* note 18, at 163.

22.  *See id.* at 146, 164, 166–69.

23.  *See* Arthur Larson, *Third–Party Action[-]Over Against Workers' Compensation Employe r,* 1982 Duke L.J. 483, 500–01. Of those courts that have barred an employee's suit against an employer's landlord, most have done so not out of a recognition that the landlord generally has immunity with respect to commercial leases but rather because the injuries did not involve structural defects. *See Chausse v. Coz,* 405 Mass. 264, 540 N.E.2d 667, 667–68 (1989) (holding that the failure to provide a low-humidity environment to avoid an explosion was not a structural defect that the landlord was under a duty to repair); *Regensdorfer v. Central Buffalo Project Corp.,* 247 A.D.2d 931, 668 N.Y.S.2d 291, 292 (1998) (stat-

ing that a clause obligating the lessor to make structural repairs would have been applicable had loose stairway treads been a structural defect). *But see O'Brien v. Island Corp.,* 157 Vt. 135, 596 A.2d 1295, 1298 (1991) ("[A] tenant having control of the premises is, so far as third persons are concerned, the owner and . . . such persons must seek redress from the tenant.").

24.  195 Ga.App. 294, 393 S.E.2d 1 (1990).

25.  *See id.* at 2, 3 n. 2.

26.  210 Cal.App.3d 771, 258 Cal.Rptr. 669 (1989).

27.  *Id.* at 675.

28.  177 W.Va. 485, 354 S.E.2d 581 (1986).

29.  *See id.* at 586–87.

30.  *Id.* at 586 (citations omitted). The court also recognized a commercial landlord's duty of reasonable care to employees of an independent contractor who are working on the premises. *See id.* at 587.

Courts have allowed suits by employees against commercial landlords even when the landlord is also the employer. In *Tanguay v. Marston*,[31] the New Hampshire Supreme Court concluded that an employee could bring a slip-and-fall suit against his employer's president and principal shareholder, who was also the lessor of the employer's business premises where the injury occurred.[32] And in *Perkins v. Scott*,[33] a Florida opinion that we quoted with approval in *Sauve I*,[34] the court held that an employee injured on the job could sue the premises owner, who was also the owner and manager of the corporate employer.[35]

Although we do believe that many of the policy reasons for protecting tenants in the context of residential leases apply with equal force to the commercial setting, this case does not require us to resolve the broad question of whether commercial landlords generally owe a duty of reasonable care to commercial tenants. Rather, we are faced with the narrower issue of whether third parties, specifically employees of a commercial tenant, may sue commercial landlords in tort. Because we acknowledge the need to protect injured third parties in both the residential and commercial lease contexts, we agree with the general trend in the case law allowing such suits and conclude that commercial landlords in Alaska owe a duty of reasonable care under the circumstances to employees of their commercial lessees.[36]

## C. A Genuine Issue of Material Fact Exists as to Whether Sauve's Injuries Stemmed from Winfree and Nix's Negligence as Landlords.

Our stated reason in *Sauve I* for remanding this case was to conduct "further inquiry into the cause of Sauve's injuries." [37] While we cautioned that Winfree and Nix should not be able to reap the benefits of their chosen business organization structure without facing the parallel consequences,[38] we recognized that if an employer's corporate and landlord duties were "inextricably intertwined," then the exclusive remedy provision would apply and Winfree and Nix would not be liable as landlords: [39]

> If ... it was the structure of the staircase that caused her injuries and landlord liability would normally attach in such a case, then Winfree and Nix should be held liable to the extent of landlords that were not otherwise involved with Sauve's employment.... However, if the cause of her injury is rooted in *corporate* duties negligently performed by Winfree and Nix in terms of their supervision of Sauve, or their corporate responsibility for the condition of the premises, then the exclusive remedy provision would bar payment of further damages resulting from duties performed "incident" to employment.[40]

To survive summary judgment, then, Sauve must raise a genuine issue of material fact both with respect to whether the structure of the staircase—and not negligent supervi-

---

**31.** 127 N.H. 572, 503 A.2d 834 (1986).

**32.** *See id.* at 837–38. The *Tanguay* court relied on the seminal case *Sargent v. Ross*, 113 N.H. 388, 308 A.2d 528 (1973), in which the New Hampshire Supreme Court emphasized the need to impose "ordinary principles of tort liability" on landlords and did not limit its discussion to residential leases. *See id.* at 531. In *Newton v. Magill*, we "further expand[ed] the landlord's duty of care in aligning Alaska with the jurisdictions following *Sargent*." *See Newton*, 872 P.2d at 1217.

**33.** 554 So.2d 1220 (Fla.Dist.App.1990).

**34.** *See Sauve I*, 907 P.2d 7, 10 n. 1, 12–13 (Alaska 1995).

**35.** *See Perkins*, 554 So.2d at 1221–22.

**36.** Because we conclude that commercial landlords owe a duty to employees of their commercial tenants, we need not address Sauve's argument that this case falls under the "retained control" and "public use" exceptions to the common law rule.

**37.** *Sauve I*, 907 P.2d at 13. The parties do not dispute that Sauve's injury was "caused" by the staircase fall. Here, when referring to the cause of Sauve's injuries, we refer more specifically to the question of whose negligence, if anyone's, caused the fall—Winfree and Nix as landlords or Winfree and Nix as 10th & M supervisors.

**38.** *See id.* at 10.

**39.** *Id.* at 13–14.

**40.** *Id.*

sion—caused her injury, and whether Winfree and Nix would be liable solely as landlords for failure to repair such a structural defect.

We believe Sauve has met her burden. First, Sauve has presented credible evidence that the faulty structure of the staircase caused her injury. For example, she submitted an affidavit from a contractor explaining that the width of the treads on the stairs on which Sauve tripped was so narrow as to violate applicable building codes. As a point of comparison, if Sauve had fallen on the staircase because it was slippery from a work-related by-product, we would most likely conclude that the injury was "rooted in *corporate* duties negligently performed by Winfree and Nix in terms of their supervision" of Sauve.[41]

Second, a genuine factual issue exists as to whether Winfree and Nix are responsible for repair of structural defects on the 10th & M premises solely in their capacity as landlords. We have already concluded that Winfree and Nix did have a duty to Sauve as commercial landlords. But Winfree and Nix maintain that they also had a duty to Sauve in their capacity as corporate officers of 10th & M, based on the terms of their oral lease with 10th & M and on 10th & M's history of voluntary repairs. Specifically, Winfree and Nix assert that their partnership, ANW Investments, has been in an oral "triple net" lease with 10th & M for over seventeen years, under which 10th & M was "exclusively responsible for insurance, taxes, and all maintenance, repairs, and improvements."[42] But such boilerplate terms do not necessarily

signify that a tenant voluntarily agrees to be responsible for *structural* repairs, such as the faulty staircase at issue here, for which a landlord normally assumes liability.

Furthermore, as Sauve argues, Winfree and Nix have interpreted the terms of the oral lease "in the manner which best suits their business purposes at any given moment." Although Sauve cannot avoid summary judgment merely by "conclusorily attacking" Winfree and Nix's credibility,[43] other factors exist that, taken in the aggregate, cast "sufficient doubt on [Winfree and Nix's] credibility to create a genuine issue of material fact."[44] These factors include the lack of a written lease, the fact that Winfree and Nix are the parties on both sides of the lease, the uncertain scope of the term "maintenance and repair" in the affidavits, and the fact that Winfree and Nix revealed the terms of the lease in a piecemeal fashion throughout discovery.[45] Moreover, such questions of credibility should generally be determined at trial rather than resolved at the summary judgment stage.[46]

In the *Tanguay* case, the New Hampshire Supreme Court reversed a grant of summary judgment against a plaintiff-employee under a similar set of facts. The employee in *Tanguay* brought a slip-and-fall suit against his employer's landlord, who was also the president and principal shareholder of the employer corporation. The court determined that a genuine issue of material fact existed as to whether the defendant was acting in his corporate capacity, notwithstanding a provision in the lease relieving the landlord of the

---

41. *See id.* at 13.

42. Sauve argues that the statute of frauds renders the triple-net lease unenforceable because it is an oral lease of more than one year. But neither party to the lease in this case seeks to contest the enforceability of its terms. A lease that would otherwise fall under the statute of frauds is enforceable if all parties admit to the making of an agreement. *See* AS 09.25.020(4).

43. *Arctic Tug & Barge, Inc. v. Raleigh, Schwarz, & Powell,* 956 P.2d 1199, 1201 (Alaska 1998).

44. *Turnbull v. LaRose,* 702 P.2d 1331, 1335 (Alaska 1985), *quoted with approval in Arctic Tug,* 956 P.2d at 1201.

45. When asked in interrogatories to state "the rental terms, including the rental price" under the lease, Winfree and Nix merely listed the annual rent and stated that "[t]he terms have not changed except to reflect adjustments and reserve requirements attached to the mortgage." Although Winfree and Nix could reasonably have read the question as referring solely to the payment terms of the lease, Sauve correctly points out the brevity of their response and the lack of discussion about the "triple-net" lease in the later affidavits.

46. *See Griffith v. Taylor,* 937 P.2d 297, 304 (Alaska 1997).

duty to repair.[47]  The court emphasized that the question of whether the employer is acting in a corporate capacity with respect to the employee's injury "is a question for the jury, unless the evidence would support only one finding as a matter of law." [48]

As for 10th & M's history of maintenance and repair, we agree with Winfree and Nix that such voluntary acts are relevant to the question of their assumed duty of repair.[49] But the repairs that 10th & M has undertaken have been traditional commercial tenant improvements rather than major structural repairs such as the faulty staircase at issue here.  The improvements made by 10th & M—freezer repair, ceiling replacement, installation of skid-resistant surfaces, "structural" bracing, painting, new signage, and new lighting—serve to maintain a safe working environment rather than to alter the structure of the building.  A change in the style, nature, or dimension of the staircase made to comply with municipal building codes is a structural change that would typically not be the responsibility of a commercial tenant.[50]

## IV.  CONCLUSION

A commercial landlord owes a duty of reasonable care under the circumstances to its lessee's employees.  Because Sauve raised a genuine issue of material fact as to whether Winfree and Nix were acting in their capacity as landlords by failing to repair the structural defect in the staircase that caused her injury, we VACATE the superior court's grant of summary judgment to Winfree and Nix and REMAND for trial.

---

**47.**  *See Tanguay v. Marston,* 127 N.H. 572, 503 A.2d 834, 836–37 (1986).

**48.**  *Id.* at 836.

**49.**  *See, e.g., Stemple v. Phillips Petroleum Co.,* 430 F.2d 178, 182 (10th Cir.1970) (holding that employees could recover in tort against a company that sublet premises to employer because the company voluntarily undertook 11 major repairs during the period of ownership).

**50.**  For example, such a structural improvement is not the type of repair easily reflected in a business's depreciation schedules for tax purposes.